UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                            :
                                                  :
AOG ENTERTAINMENT, INC., *et al.*,                :          Chapter 11
                                                  :          Case No. 16-11090 (SMB)
                        Debtors.                  :          (Jointly Administered)
------------------------------------------------------X
CORE LITIGATION TRUST, by and through            :
its duly appointed trustee, Peter Kravitz,       :
                                                  :
                        Plaintiff,                :
                                                  :
        – against –                               :          Adv. Pro. No. 18-01540 (SMB)
                                                  :
APOLLO GLOBAL MANAGEMENT, LLC;                   :
TRAVIS HENNINGS; LEE SOLOMON;                     :
AARON STONE; AP NMT COOPERATIEF                   :
U.A.; APOLLO CORE HOLDINGS, L.P.; CORE           :
ENTERTAINMENT HOLDINGS INC.; and                 :
and DOES 1-100,                                   :
                                                  :
                        Defendants.               :
------------------------------------------------------X

## MEMORANDUM DECISION GRANTING
## MOTION FOR PERMISSIVE ABSTENTION

**A P P E A R A N C E S :**

QUINN EMANUEL URQUHART QUINN
  EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

        Jennifer Nassiri, Esq.
        Scott C. Shelley, Esq.
        Eric D. Winston, Esq.
            Of Counsel

*Attorneys for Plaintiff*

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036

        Jonathan Rosenberg, Esq.
        Daniel S. Shamah, Esq.

Of Counsel

*Attorneys for Defendants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The CORE Litigation Trust ("Trust") commenced this adversary proceeding

alleging that one or more of the Defendants breached their fiduciary duties, aided and

abetted the same, and benefitted from an intentional fraudulent transfer to a non-party.

The Defendants have moved for permissive abstention pursuant to 28 U.S.C. §

1334(c)(1), or alternatively, to dismiss the Trust's complaint, dated Apr. 27, 2018

("*Complaint*") (ECF Doc. # 1)[1] for failure to state a claim pursuant to Rule 12(b)(6)

Federal Rules of Civil Procedure.[2]  For the reasons that follow, the Court will abstain in

---

[1]    Unless otherwise indicated, "ECF" refers to the electronic docket in this adversary proceeding.

[2]    Defendants' motion to dismiss was supported by a *Defendants' Joint Memorandum of Law in Support of Defendants' Motion For Permissive Abstention or in the Alternative to Dismiss for Failure to State a Claim*, dated June 29, 2018 ("*Motion*" or "*MTD*") (ECF Doc. # 7), along with ten document exhibits appended to the *Declaration of Daniel S. Shamah, Esq. in Support of Defendants' Motion for Permissive Abstention or in the Alternative to Dismiss for Failure to State a Claim* ("*Shamah Decl.*") (ECF Doc. # 8).  On August 23, 2018, the Trust filed its response to Defendants' *Motion* (*see Core Litigation Trusts* [*sic*] *Memorandum of Law in Opposition to Defendants' Motion for Permissive Abstention or in the Alternative to Dismiss for Failure to State a Claim* ("*Opposition*" or "*Opp.*") (ECF Doc. # 16)), and on September 27, 2018, Defendants filed their reply (*see Reply Memorandum of Law in Support of Defendants' Motion for Permissive Abstention of in the Alternative to Dismiss the Complaint for Failure to State a Claim* ("*Reply*") (ECF Doc. # 18)).  The Reply was accompanied by another declaration (*see Reply Declaration of Daniel S. Shamah Esq. in Support of Defendants' Motion for Permissive Abstention or in the Alternative to Dismiss for Failure to State a Claim* ("*Reply Decl.*") (ECF Doc. # 19).  The *Reply Decl.* appended two additional exhibits, one of which was filed under seal on leave of the Court.  (*See Order Granting Defendants' Motion to File Exhibit B to Reply Declaration Under Seal*, dated October 18, 2018 (ECF Doc. # 22).)  Thereafter, on November 21, at the Court's request, counsel for the Trust provided the Court with the following additional documents incorporated by reference in the *Complaint*: (i) the proofs of claim filed in the main bankruptcy case by Defendants Travis Hennings, Lee Solomon, and Aaron Stone (*see Complaint* at ¶¶ 20-22); (ii) a term sheet allegedly provided by Apollo to certain of CORE Media's officers (*see id.* at ¶ 44); (iii) minutes of CORE Holdings' 2018 board meetings on February 18, 24, and 26 (*see id.* at ¶¶ 59, 60, 65, 67, 74); and (iv) a Powerpoint presentation provided at the February 24 board meeting (*see id.* at ¶¶ 69-72).

At oral argument, the Court instructed the parties to submit further briefing relating to the Trust's intentional fraudulent transfer claims.  On December 11, 2018, the parties filed supplemental briefs.

the exercise of its discretion in light of a pending state court action involving the same facts and inconsistent claims.

## BACKGROUND

The background discussion is derived from the well-pleaded factual allegations of the *Complaint*, the documents on which the *Complaint* relies or are integral to the *Complaint* and other information which is subject to judicial notice.

CORE Media Group, Inc. ("CORE Media") was a television and entertainment company whose assets included the rights to the television programs "American Idol" and "So You Think You Can Dance." (¶ 28.)[3]  In addition, CORE Media had owned certain intellectual property rights related to the works and likenesses of Elvis Presley and Muhammad Ali ("Elvis/Ali Rights"). (¶ 29.)  On April 28, 2016, CORE Media and certain affiliates (but not Defendant CORE Entertainment Holdings, Inc. ("CORE Holdings")) filed for chapter 11 protection. (¶ 14.)  The Trust was formed under the Debtors' confirmed plan and is the successor to Debtors' claims against Defendants and certain claims assigned by the Debtors' secured creditors. (¶ 17.)

Defendants Travis Hennings, Lee Solomon, and Aaron Stone (collectively, "Director Defendants") were directors of CORE Media beginning June 16, 2011. (¶¶ 20-22.)  The other named Defendants are AP NMT Cooperatief U.A. ("AP Coop")—a

---

[3]     The citation "¶" refers to a paragraph in the *Complaint*.

Netherlands-based Apollo affiliate, non-Debtor CORE Holdings, and Apollo CORE

Holdings, L.P.  (¶¶ 23, 25, 26.)[4]

### A.    Apollo Global Acquires Control of CORE Media

As of June 2011, CORE Media, then known as CKx, Inc., was a publicly-traded

company.  In June 2011, Apollo Global Management, LLC ("Apollo") acquired control of

CORE Media through a leveraged buyout ("LBO") tender offer that merged CORE Media

indirectly into Apollo.  The merger was effectuated by Apollo affiliates.  (¶ 30.)  It

appears that after the merger, Apollo affiliate, Defendant Apollo CORE Holdings, L.P.

("Apollo Holdings"), owned 100% of the shares of Defendant CORE Holdings, CORE

Media's indirect parent.  (¶ 23; *see Declaration of Peter Hurwitz, President of Certain*

*Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, dated Apr. 28,

2016, at ¶ 19 (ECF Main Case Doc. # 3).)  At some point, Apollo "hand-picked"

Defendants Travis Hennings, Lee Solomon, and Aaron Stone (collectively, "Director

Defendants"), its employees, (*see MTD* at 6), to serve as the directors of CORE Holdings

and CORE Media.  (¶¶ 1, 19.)  Each Director Defendant filed a proof of claim asserting

contingent and unliquidated claims arising from his service as a CORE Media director.

(¶¶ 20-22.)

The LBO had been financed, in part, by a $360 million bridge loan.  (¶ 30.)   In

December 2011, Apollo refinanced the bridge loan through two secured term loans,

whereby Debtor CORE Entertainment, Inc. ("CORE Entertainment"), CORE Media's

indirect parent, borrowed $200 million pursuant to a First Lien Loan, and another $160

---

[4]     Another Defendant, AP NMT JV Newco B.V., was voluntarily dismissed pursuant to Federal Rule
of Civil Procedure 41(a)(1)(A)(i).  (*Notice of Dismissal*, dated Aug. 23, 2018 (ECF Doc. # 15).)

million pursuant to a Second Lien Loan (together, "Secured Loans").  (¶¶ 31-32.)[5]

Under the Secured Loans' terms, so long as CORE Entertainment did not default, no

principal payments were due until the loans matured in June 2017 and 2018.  (¶¶ 31-

32.)

### B.     Huff Shareholder Litigation

The LBO was valued at over $500 million ("LBO") or $5.50 per share for CORE

Media stock.  (¶ 30.)  Not everyone was satisfied.  On September 8, 2011, the Huff Fund

Investment Partnership ("Huff"), a CORE Media shareholder at the time of the LBO,

commenced an appraisal action in the Delaware Chancery Court to contest the tendered

price per share.  (¶ 33.)  Following a trial, the Chancery Court held that the $5.50 merger

price constituted fair value and in or about June or July 2014, entered a judgment

against CORE Media in Huff's favor for $75,443.549.60, plus interest in the sum of

$13,831.140.19 ("Huff Judgment").[6]  Interest on the Huff Judgment continued to accrue

"in the amount of $14,061.61 per diem from June 1, 2014," with interest compounding

after June 30, 2014, until the judgment was paid in full.  (Huff Judgment at 3.)  On

February 12, 2015, the Delaware Supreme Court affirmed the Huff Judgment.  (¶ 36.)

Consequently, CORE Media was required to pay Huff approximately $75 million, plus

approximately $18 million in accrued interest.  (*Id.*)

### C.     CORE Sells the Elvis/Ali Rights

---

[5]      CORE Holdings, CORE Media, and other CORE subsidiaries were guarantors under the Secured
Loans. (*Id.* ¶¶ 31-32.)

[6]      A copy of the Huff Judgment is annexed as Exhibit B to the *Shamah Declaration*.

In the first quarter of 2012, Apollo acquired an equity interest in Endemol USA

Holding, Inc. ("Endemol"), a distributor of popular U.S. television franchises "Big

Brother," "Fear Factor," and "Deal or No Deal." (¶ 40.)  In October 2012, Apollo and

Twenty-First Century Fox ("Fox") entered into a confidentiality agreement in

contemplation of a business combination by and among Fox's Shine Group ("Shine"),

Endemol, and Core Media ("Joint Venture").[7] (¶ 41.)

In 2013, at Apollo's direction, CORE Media sold the Elvis/Ali Rights—a revenue

stream worth $16 million in EBITDA that year—for approximately $115 million

("Elvis/Ali Proceeds") and placed the Elvis/Ali Proceeds in an unrestricted subsidiary in

furtherance of Apollo's scheme to free up cash on CORE Media's balance sheet to

enhance its value as a target and boost Apollo's ability to cash out its equity.  (¶¶ 42, 43.)

Apollo represented to CORE Media's officers that the Elvis/Ali Proceeds would be

available for new investments.  (¶ 43.)

In or about February 2014, Apollo drafted a term sheet summarizing the details

of a proposed business combination of CORE Media, Endemol and Shine.  (¶ 44.)  The

term sheet, drafted by Apollo and provided to CORE Media's officers, indicated that one

source of funding for the Joint Venture would be "up to $117 million direct or indirect

investment in NewCo by unrestricted subsidiaries of CORE [Media](the "CORE

Investment") (it being understood that the amount of the CORE Investment represents

the entirety of the [Elvis/Ali Proceeds])."  (¶ 44.)

---

[7]    The *Complaint* initially defined the Joint Venture as a combination of CORE Media, Endemol and
Shine. (¶ 2.)  It subsequently defined the Joint Venture as former defendant AP NMT JV Newco B.V., the
100% owner of CORE Media as of the Petition Date.  (¶ 24.)

Apollo also made personal representations to CORE Media's management suggesting the Elvis/Ali Proceeds would be used for CORE Media's benefit—either for generating revenue-producing projects or in furtherance of a business combination. (¶¶ 45-46). For example, Apollo told a senior officer at CORE Media that the Sale Proceeds could be used to acquire a stake for CORE Media in a merger with Endemol. (¶ 45.) In addition, Director Defendant Aaron Stone purportedly told Marc Graboff, CORE Media's president at the time, that CORE Media's debt was "distressed," and that Apollo planned to facilitate a "full operational merger" of CORE with Endemol. (¶ 46.)

Instead, the Trust alleges, Apollo "refused" to let CORE Media invest the Elvis/Ali Proceeds in return for a stake in the Joint Venture or for any other "commercially reasonable" purpose and kept it in a low-interest bearing account. (¶¶ 2, 3, 47, 84.) The Trust asserts on information and belief that Apollo preferred that the Elvis/Ali Proceeds remain on the CORE subsidiary's balance sheet to make it easier for Apollo to obtain financing for a CORE business combination. (¶ 47.) During this time, the CORE Media Board apparently consisted exclusively of the Director Defendants. (¶ 51 ("Throughout 2014, the Director Defendants were directors of CORE Media."); *MTD* at 6 ("The CORE Media board at that time consisted of Defendants Travis Hennings, Lee Solomon, and Aaron Stone, who were Apollo employees.").) The *Complaint* does not refer to any other CORE Media directors. The *Complaint* further avers that throughout 2014, while the Elvis/Ali Proceeds sat in a bank account, the CORE Media Board did not hold any meetings. Instead, decisions were made through an executive committee consisting of the Director Defendants, and there are no minutes or other corporate governance records relating to the use, if any, of the Elvis/Ali Proceeds. (¶ 51.)

7

### D.    Business Combination Agreement

On October 9, 2014, Defendant AP Coop, apparently an Apollo affiliate, Defendant Apollo Holdings and non-party 21st Century Fox Europe and Asia, Inc. entered into the Business Combination Agreement ("*BCA*").[8] (¶ 48.) In substance, through a complicated set of transactions outlined in *BCA* at § 2.1, Apollo Holdings transferred its stock in CORE Holdings (and hence, its indirect ownership of CORE Media), as well as its interest in Endemol, to the Joint Venture (defined as "HoldCo") (*BCA* at p. 9), Fox simultaneously transferred its interest in Shine to HoldCo, and Fox and AP Coop each received a 50% ownership stake in HoldCo. In addition, Apollo received between $100 and $175 million in cash from Fox. (¶ 48.)

The *BCA* included several key provisions concerning the Huff Judgment, which was pending appeal at the time of closing. First, CORE Holdings represented that CORE Media maintained a Citibank account with $75.6 million in cash, reserved exclusively to satisfy the Huff Judgment ("Huff Reserve"). (¶ 35; *see also BCA* at § 3.22 ("As of the date hereof, [CORE Media] maintains the Huff Reserved Account with respect to the Huff Appraisal Rights Matter, which had a balance as of the date hereof equal to the amount set forth on Section 3.22(a) of the CORE Disclosure Schedule (the 'Huff Reserved Amount') . . . ."); *CORE Disclosure Schedule 3.22* (designating $75.6 million as Huff Reserved Amount).)[9] Second, AP Coop and CORE Holdings covenanted that pending the closing the Huff Reserve would not be used for any purpose other than to

---

[8]    The *BCA* is attached as Exhibit C to the *Shamah Decl.*

[9]    The *CORE Disclosure Schedule 3.22* is attached as Exhibit D to the *Shamah Decl.*

satisfy the Huff Judgment and related costs and expenses.  (¶ 49.)[10]  Third, AP Coop

agreed to indemnify Fox "from, against and in respect to all Losses . . . based upon,

arising out of or incurred as a result of"

> (c) (i) any Huff Interest and Huff Legal Fees actually paid or required to be
> paid by CORE or its Subsidiaries and (ii) without duplication of the
> amount set forth in clause (i) above, the aggregate amount actually paid or
> required to be paid by CORE or its Subsidiaries (including any such
> amounts actually paid by CORE or its Subsidiaries pursuant to any
> settlement or judgment) pursuant to the Huff Appraisal Rights Matter in
> excess of (x) the Huff Reserved Amount plus (y) any interest accrued
> thereon from and after the date hereof (collectively, "Huff Appraisal Rights
> Losses")[.]

(*BCA* at § 10.2(c) (emphasis added).) [11]

The indemnity was subject to two limitations.  First, AP Coop did not have to

indemnify Fox until the Huff Appraisal Rights Losses exceeded $15 million, *i.e.,* when

the Huff Judgment liability surpassed the $75.6 million Huff Reserve by $15 million.

(*BCA* at § 10.4(b)(iii) ("AP Coop shall not have any obligation to indemnify [Fox]

pursuant to Section 10.2(c) unless and until the aggregate amount of all Huff Appraisal

---

[10]    The covenant stated, in pertinent part, that:

> From the date of this Agreement *until the Closing*, CORE Holdings shall cause CORE and
> each of CORE's Subsidiaries to conduct their business and operations in the ordinary
> course of business consistent with past practice . . .
>
> Without limiting the generality of the foregoing, except as contemplated by this
> agreement . . . CORE Holdings shall not and shall cause CORE and each of CORE's
> Subsidiaries not to:
> . . .
> (xvi) distribute or use any funds from the Huff Reserved Account other than for the
> purpose of paying any Huff Legal Fees, Huff Interest or any other amounts in connection
> with the Huff Appraisal Matter[.]

(*BCA* at § 6.1(a)(xvi) (emphasis added).)

[11]    According to *CORE Disclosure Schedule 3.22*, as of October 3, 2014, Huff Interest totaled $15.7
million, and CORE Media had incurred $8.3 million in Huff Legal Fees, $6.8 million of which it had
already paid.

Rights Losses exceeds $15,000,000 . . . .").)  Second, once the Huff Appraisal Rights

Losses exceeded the $15 million hurdle, AP Coop's obligation to indemnify Fox was

limited to the losses apportioned to Fox's 50% share of HoldCo.  (*Id.*)  In short, AP Coop

only had to indemnify Fox for 50% of the amount paid on account of the Huff Judgment

in excess of $90.6 million.

According to the Trust, no CORE Media officer saw the "full" *BCA* until 2017.  (¶

50.)  The *Complaint* alleges that the Defendants hid the *BCA* from CORE to conceal the

covenant and indemnification provisions relating to the Huff Judgment.  (*Id.*)

### E.     CORE Descends into Insolvency

CORE[12] was "likely" insolvent by early 2014.  (¶ 52.)  According to CORE's

consolidated financial statements for 2013, its total liabilities exceeded its total assets by

over $14 million and it was operating at a net loss of $134 million.  *Id.*)  Declining

revenues from key assets like "American Idol" and "So You Think You Can Dance"

aggravated CORE's financial hardships.  (¶¶ 53, 55.)  Moody's downgrade of CORE's

corporate family rating further exacerbated the situation.  (¶ 55.)  The *Complaint* avers

that the downgrade was caused, at least in part, by CORE Media's failure to reinvest the

Elvis/Ali Proceeds.  (*Id.*)  By February 2015, when the Delaware Supreme Court

affirmed the Huff Judgment, CORE Media's assets were worth far less than the $360

million it still owed under the Secured Loans.  (¶ 57; *see* ¶¶ 56, 58.)

### F.     CORE Media Pays the Huff Judgment

---

[12]     The term "CORE" is defined in the *Complaint* as "CORE Media and various of its affiliates."  (¶
14.)

After the Huff Judgment was affirmed, the Board of Directors for CORE Holdings convened three times to deliberate, and eventually authorize, payment of the Huff Judgment. (¶¶ 59, 67, 73.) By then, the Board consisted of ten directors: the three Director Defendants (Hennings, Solomon, and Stone), three directors appointed by Fox (David DeVoe, Eleni Lionaki, and Jeff Palker), and four directors with no alleged affiliations (Peter Brown, Ross Lukatsevich, Barry Siegel, and Priscilla Presley). (¶ 59.) The *Complaint* does not allege whether the CORE Media Board met simultaneously or separately, if at all, or whether it shared the same directors as the CORE Holdings Board.

The first meeting took place on February 18, 2015, with the full CORE Holdings Board in attendance. (¶ 59.) Attorneys from Paul Weiss Rifkind Wharton & Harrison LLP ("Paul Weiss"), counsel to CORE Holdings and CORE Media, also attended. (¶ 59.)[13] Paul Weiss distributed a presentation to CORE Holdings, which explained that on February 27, the Huff Judgment would be remanded to the Chancery Court with a mandate to satisfy the $93.1 million judgment to follow soon after. (¶ 60; *Reply Decl.* at Ex. B [Under Seal] ("*February 18 Presentation*"), 2, 5.) The *February 18 Presentation* urged the Board to decide the payment issue in light of their fiduciary duties by February 27. (*February 18 Presentation* at 5-8.) The Board was advised that non-payment could lead Huff to "seize CORE[14] bank accounts or other assets to collect the judgment." (*February 18 Presentation* at 9.) Paul Weiss further advised that CORE

---

[13]    The *Complaint* alleges that Paul Weiss was also representing Apollo at the time but does not elaborate on the nature of the representation. (¶ 59.)

[14]    In the presentations to the Board, "CORE" referred to CORE Media.

could seek chapter 11 relief to prevent asset seizures and might even be able to

subordinate the Huff Judgment, but filing a petition without a negotiated plan in place

posed a "time consuming, costly and uncertain proposition." (*February 18 Presentation*

at 9; *see also Complaint* at ¶ 61.)

The Trust asserts that the *February 18 Presentation* did not disclose the terms of

the *BCA*, and specifically, the covenant and indemnity regarding the Huff Judgment. (¶

63.) Nor did Apollo heed the warnings of CORE Media's senior officers about CORE

Media's potential insolvency. (¶ 64.) In fact, the draft of the February 18 minutes

deleted specific references to CORE Media's insolvency. (¶ 65.) CORE Media's officers

were bewildered by Apollo and Paul Weiss's insistence on satisfying the Huff Judgment.

(¶ 66.)

The Board next met on February 24; all but one of the directors, a Fox appointee,

attended. (¶ 67.) Paul Weiss provided another presentation at the meeting ("*February

24 Presentation*") which reiterated the implications of non-payment (*see February 24

Presentation* at 8) and warned that a non-negotiated chapter 11 filing could "have a

significant adverse affect [*sic*] on the company." (*February 24 Presentation* at 10.)

Paul Weiss also cautioned the Holdings Board that a free-fall chapter 11 filing could

expose CORE to litigious creditors and a lengthy, costly path to confirmation. (*Id.*)

Conversely, satisfying the judgment would enable CORE "to embark upon an orderly

process to restructure or refinance the debt" owed to the CORE's lenders under the

Secured Loans ("Secured Lenders"). (*February 24 Presentation* at 4; *Complaint* at ¶

69.) The *February 24 Presentation* included financial data that showed CORE Media's

total liabilities for year-end 2014 exceeded its total assets by over $100 million. (*February 24 Presentation* at 19.)

The *Complaint* characterizes the *February 24 Presentation* as "intentionally, and unduly, optimistic" about the merits of satisfying the Huff Judgment. (¶ 69.) According to the Trust, Paul Weiss lacked any basis to claim that paying Huff would better position CORE to refinance the Secured Loans, which were coming due in 2017 and 2018, and already required significant interest payments in 2015 and 2016. (¶ 69.) The Trust also claims that the *February 24 Presentation* falsely portrayed "American Idol" as stabilizing, even though its ratings and revenue had been trending downward, and Fox would announce within the month that it was not renewing the show. (¶ 70.)

On February 26, the Holdings Board met for the third and final time and unanimously voted to pay the Huff Judgment ("Huff Payment"). (¶¶ 73, 74; *Minutes of the Board of Directors of CORE Entertainment Holdings, Inc., February 26, 2015* ("*February 26 Minutes*").)[15] The *February 26 Minutes* did not disclose whether Apollo had an interest in authorizing the Huff Payment or if any Director Defendant had a personal conflict. (¶ 74.) The Huff Payment was made in March 2015. (¶ 77.) Shortly thereafter, CORE Media's financial statements revealed significant deterioration in year-over-year adjusted EBITDA. (¶¶ 78-79.) In June 2015, CORE Entertainment missed an interest payment on the Second Lien Loan, resulting in default. (¶ 80.) Less than a year later, the Debtors filed for chapter 11.

---

[15]    Although the *Complaint* alleges that the meeting was fully attended (¶ 73), the *February 26 Minutes* indicate that Mr. Davoe, a Fox appointee, was absent.

### G.    The State Court Lender Action

On December 12, 2016, the Trust filed a complaint in Los Angeles County Superior Court asserting tortious interference and breach of contract claims against Apollo and others ("Lender Action").  (*CORE Litig. Tr. v. Apollo Glob. Mgmt., LLC*, No. BC643732 (Cal. Sup. Ct.), filed Dec. 12, 2016 ("*California Complaint*").)[16]  The *California Complaint* claims had been assigned to the Trust by the Secured Lenders. (*Opp.* at 4; *see also Findings of Fact, Conclusions of Law and Order Signed on 9/22/2016 Confirming Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors*, entered September 23, 2016, at §§ 1.88, 7.1 ("*Plan*") (ECF Main Case Doc. # 436).)  Certain defendants in the Lender Action are not named in the *Complaint*, including Fox, Endemol and certain Apollo-related entities.  (*See California Complaint* at ¶¶ 23-44).)  The Director Defendants, on the other hand, are not defendants in the Lender Action.  (*Opp.* at 5.)  AP NMT JV Newco B.V., d/b/a Endemol Shine Group, *i.e.*, the Joint Venture, is a defendant in the Lender Action but has been dismissed as a defendant from this adversary proceeding.

The allegations in the *California Complaint* were summarized by the Court in the *Mandatory Abstention Decision* (defined below).  In the main, the Trust asserted that Apollo and its co-defendants tortiously interfered with agreements governing the Secured Loans ("Loan Agreements"), triggering breaches under the Successor Obligor and Change of Control Clauses in the parties' Loan Agreements.[17]  These transactions

---

[16]    The *California Complaint* is attached as Exhibit E to the *Shamah Decl.*

[17]    Section 6.05(a)(1) of each Loan Agreement provided that CORE Entertainment f/k/a CKx Entertainment, Inc. (the "Borrower"), CORE Media's indirect parent, would not merge with or sell substantially all of their assets to another company unless the successor entity expressly assumed all of its obligations under the Loan Agreements (the "Successor Obligor Clause").  (*California Complaint* at ¶ 56.)

14

caused CORE Entertainment and the guarantors to default in their payment obligations and drained the CORE entities of liquidity, interfered with the rights of creditors under the Loan Agreements, prevented the CORE entities from exploiting opportunities and made the exercise of the Secured Lenders' rights more costly and burdensome.

## H.    *Mandatory Abstention Decision*

After the California defendants removed the Lender Action to California federal court, they successfully moved to transfer the action to this District.  (*Opp.* at 4; *MTD* at 11.)  Following referral to this Court by the District Court, the Trust moved for both mandatory and permissive abstention pursuant to 28 U.S.C. § 1334(c).  The Court granted the Trust's motion for mandatory abstention and remanded the Lender Action to California state court.  *Core Litig. Tr. v. Apollo Glob. Mgmt., LLC, et al.* (*In re AOG Entm't, Inc.*), 569 B.R. 563, 585 (Bankr. S.D.N.Y. 2017) ("*Mandatory Abstention Decision*").[18]

## I.    *New York Complaint*

Following remand to the California Court, the Defendants moved to dismiss or stay the Lender Action on *forum non conveniens* grounds.  (*MTD* at 11.)  On October 3, 2017, the motion was granted, prompting the Trust to re-file the Lender Action in New York State Supreme Court.  (*MTD* at 11-12; *see generally Core Litig. Tr. v. Apollo Glob.*

---

Section 2.08(f) of each Loan Agreement stated that in the event of a "Change of Control," the Borrower would prepay all outstanding loans plus a premium within 30 days of the Change of Control (the "Change of Control Clause"). (*Id.* at ¶ 57.)  A "Change of Control" was defined as an acquisition by any person or group of more than 50% of the total voting power of the Voting Stock of the Borrower. (*Id.*)

[18]    The Court did not rule on the Trust's motion for permissive abstention.  *Id.*

*Mgmt., LLC*, No. 656856/2017 (N.Y. Sup. Ct.), filed Nov. 9, 2017 ("*New York Complaint*").)[19]

The *New York Complaint* is essentially identical to the *California Complaint*. It alleges that Apollo[20] and the other defendants intentionally interfered with the Loan Agreements by executing the *BCA* transaction, causing Apollo to lose "control" of CORE, thus triggering the Secured Lenders' "Change of Control" rights. (*New York Complaint* at ¶¶ 92-96, 99-100; *MTD* at 12.) The Trust alleges that transactions executed to advance the *BCA* transaction, including the sale of the Elvis and Ali Rights (*New York Complaint* at ¶¶ 152, 155), "drained CORE of revenue generating potential" and "caused CORE to shift its strategic focus in directions intended to benefit the anticipated Joint Venture rather than benefit CORE itself . . . ." (*Id.* at ¶ 98.) These actions allegedly "interfered with CORE's performance of its obligations under the [Loan Agreements] by crippling its ability to exploit new opportunities and . . . further distressed CORE's financial condition." (*Id.* at ¶ 100.)

The Apollo-affiliated defendants moved to dismiss the *New York Complaint* for failure to state a claim on January 18, 2018. The state court heard argument on May 17, 2018, and took the motion under advisement. (*MTD* at 13.)

---

[19]     The *New York Complaint* is attached as Exhibit J to the *Shamah Decl.*

[20]     The *New York Complaint* uses "Apollo" to mean all of the Apollo-affiliates, including Apollo Global Management, LLC, a defendant in this adversary proceeding. The *New York Complaint* alleges that the Joint Venture is an alter ego of CORE Holdings. (*New York Complaint* at ¶ 25.).

### K.    This Adversary Proceeding

The Trust commenced this adversary proceeding on April 27, 2018.  The

*Complaint* asserts the following six claims for relief:

| Count | ¶¶ | Defendants | Nature of Claim |
|---|---|---|---|
| 1 | 81-90 | Director Defendants | Breach of fiduciary duty of loyalty in refusing to permit CORE Media to invest the Elvis/Ali Proceeds in the Joint Venture or in any other commercially reasonable manner. |
| 2 | 91-94 | Apollo | Aiding and abetting the Director Defendants' breach of their duty of loyalty. |
| 3 | 95-103 | CORE Holding and the Director Defendants | Breach of the fiduciary duty of loyalty in paying the Huff Judgment. |
| 4 | 104-07 | Apollo, Apollo Holdings, AP Coop, CORE Holdings and the Director Defendants | Aiding and abetting the breach of the fiduciary duty of loyalty in connection with the payment of the Huff Judgment. |
| 5 | 108-13 | Apollo | Recovering the Huff Payment from Apollo under 11 U.S.C. § 550(a) because the Huff Payment was an intentional fraudulent transfer under the Bankruptcy Code and the Apollo was the beneficiary of the transfer. |
| 6 | 114-21 | Apollo | Recovering the Huff Payment from Apollo under 11 U.S.C. § 550(a) because the Huff Payment was an intentional fraudulent conveyance under the New York Debtor & Creditor Law and Apollo was the beneficiary of the transfer. |

The Defendants have moved for permissive abstention, or alternatively, to

dismiss the *Complaint* for failure to state a claim on which relief can be granted.  As to

the former, they accuse the Trust of forum shopping and splitting its claims between the

Lender Action and this adversary proceeding.   They further argue that the adversary

proceeding will not impact the administration of the estate, Delaware state law issues

predominate, the sole basis of jurisdiction is 28 U.S.C. § 1334 and the pendency of the

two New York litigations before different courts raises the danger of conflicting findings.

(*MTD* at 3, 14-20.) Alternatively, they argue that the *Complaint* is legally insufficient for

several reasons discussed below. (*Id.* at 3-5, 20-31.)  In response, the Trust argues that

abstention is inappropriate because it has not engaged in forum shopping, the

fraudulent transfer claims are "core," and the claims in the Lender Action are not closely

related to the claims in this adversary proceeding. (*Opp.* at 5-14.)  Furthermore, the

*Complaint* adequately states claims, (*id.* at 14-39) and seeks leave to amend to the

extent the *Complaint* is deficient. (*Id.* at 39.) [21]

## DISCUSSION

### A.    **Permissive Abstention**

Pursuant to 28 U.S.C. § 1334(c)(1), a court may abstain from hearing a

proceeding within its jurisdiction "in the interest of justice, or in the interest of comity

with State courts or respect for State law."  Permissive or discretionary abstention was

intended to codify non-bankruptcy judicial abstention doctrines, *Coker v. Pan Am.

World Airways* (*In re Pan Am. Corp.*), 950 F.2d 839, 845 (2d Cir. 1991), which

recognized "the virtually unflagging obligation of the federal courts to exercise the

jurisdiction given them."  *Colorado River Water Conservation Dist. v. United States*,

424 U.S. 800, 817 (1976); *see also Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*,

487 B.R. 158, 165 (S.D.N.Y. 2013) (noting "presumption against abstention").

---

[21]    Given the Court's decision to abstain, it does not address the legal sufficiency of the claims or the
request for leave to amend.

The movant bears the burden of establishing that permissive abstention is warranted, *Bickerton v. Bozel S.A.* (*In re Bozel, S.A.*), 434 B.R. 86, 102 (Bankr. S.D.N.Y. 2010), and the decision whether to abstain is committed to the Court's discretion. *See Abir v. Malky, Inc.* (*In re Abir*), No. 09 CV 2871(SJF), 2010 WL 1169929, at *7 (E.D.N.Y. Mar. 22, 2010) (citing *In re Petrie Retail, Inc.*, 304 F.3d 223, 232 (2d Cir. 2002). Among the factors the Court may consider are

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*New York City Emps. Ret. Sys. v. Ebbers* (*In re Worldcom Secs. Litig.*), 293 B.R. 308, 332 (S.D.N.Y. 2003) (quoting *Masterwear Corp. v. Rubin Baum Levin Constant & Friedman* (*In re Masterwear Corp.*), 241 B.R. 511, 520 (Bankr. S.D.N.Y. 1999)); *Peterson v. 610 W. 142 Owners Corp.* (*In re 610 W. 142 Owners Corp.*), No. 94 B 44488(JGH), 1999 WL 294995, at *3 (S.D.N.Y. May 11, 1999). Not all of the factors need be applied, and the "balance [of the factors] should be 'heavily weighted in favor of the exercise of jurisdiction.'" *In re Portrait Corp. of Am.*, 406 B.R. 637, 642 (Bankr. S.D.N.Y. 2009) (*quoting Eastern Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO* (*In re Ionosphere Clubs, Inc.*), 108 B.R. 951, 954 (Bankr. S.D.N.Y. 1989)).

Several of the factors plainly weigh in favor of abstention.  First, the adversary
proceeding will not affect the administration of the estates that remain open (Factor #
1).  The Trust apparently agrees.  (*Opp.* at 13 ("The Trust does not disagree that any
effect will be minor, at best.").)  In fact, the *Mandatory Abstention Decision* dealt with
same issue in a different context, ruling that remanding the removed action back to the
California state court would not prolong the administration or liquidation of the estates;
the Debtors had confirmed their plan, the cases remained open for independent
reasons, were otherwise fully administered and any proceeds recovered by the Trust
would be distributed in accordance with the plan.  *Mandatory Abstention Decision*, 569
B.R. at 584-85.  Second, except for Count 5 and to some extent Count 6, state law issues
predominate (Factor # 2), the claims arose pre-petition and are non-core (Factor # 7)
and are remote from the bankruptcy cases (Factor # 6).  Even the intentional fraudulent
transfer claim alleged in Count 6 is based on state law.  Third, the only jurisdictional
basis for the adversary proceeding is 28 U.S.C. § 1334(b) (Factor # 5).[22]

Other factors militate against abstention.  The state law claims are not
particularly unsettled or difficult (Factor # 3).  The breach of fiduciary duty and
probably the aiding and abetting claims are governed by Delaware law which is well-
settled and has been applied by this Court in the past.  *E.g., Responsible Pers. of
Musicland Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), 424
B.R. 95 (Bankr. S.D.N.Y. 2010); *Responsible Pers. of Musicland Holding Corp. v. Best
Buy Co., Inc.* (*In re Musicland Holding Corp.*), 398 B.R. 761 (Bankr. S.D.N.Y. 2008).  In

---

[22]    The parties are also entitled to a jury trial.  (Factor # 11).  No party has made a jury demand but
the time within which to do so has not expired.

addition, although any litigation is a burden on the Court's docket (Factor # 9), I cannot conclude that this factor weighs in favor of abstention for that reason.

## B.   Forum Shopping and Relatedness

The two most controversial factors raised by the parties concern relatedness to the Lender Action (Factor # 4) and forum shopping (Factor # 10).  "Forum shopping occurs when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice." *Riviera Trading Corp. v. Oakley, Inc.,* 944 F. Supp. 1150, 1158 (S.D.N.Y.1996) (citation omitted); *accord Star Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421, 434-35 (S.D.N.Y. 2018); *Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.,* 178 F. Supp. 2d 459, 470 (S.D.N.Y. 2002).  The Defendants' forum shopping argument, to the extent directed at the initiation of the Lender Action first in California and then in New York, lacks merit.  The Trust always wanted to litigate the Lender Action in California.  The Defendants removed the Lender Action to California federal district court and successfully moved to transfer the Lender Action to New York.  In the *Mandatory Abstention Decision,* this Court granted the Trust's motion to remand it back to California state court under principles of mandatory abstention.  Once back in California, the Defendants successfully moved to dismiss or stay the *California Complaint* on *forum non conveniens* grounds.  This left the Trust no choice but to refile the Lender Action in the New York State Supreme Court.  Moreover, by convincing the California Court that the New York forum was more convenient, the Defendants cannot contend that New York lacks a significant connection to the facts of the Lender Action.

Instead, the forum shopping and relatedness arguments focus on the Trust's decision to file the Lender Action in New York state court and the adversary proceeding less than six months later in this Court even though, the Defendants contend, the two are related. (*See MTD* at 3, 15-17.) The Defendants suggest that the Trust bifurcated its claims in order to advance incompatible arguments in separate fora without exposing the factual and legal commonalities and inconsistencies between the two lawsuits. (*See id.* at 17.) The selection of a different venue to litigate an incompatible theory does imply forum shopping. *Cf. Iragorri v. United Tech. Corp.,* 274 F.3d 65, 72 (2d Cir. 2001) (forum shopping under a forum *non conveniens* multi-factor analysis includes an attempt to win a tactical advantage). While I give the Trust the benefit of the doubt on this factor and find it neutral, it is nevertheless clear that the two lawsuits are so related that trying them separately will waste judicial resources and possibly lead to inconsistent results.

In deciding whether to permissively abstain, "courts weigh considerations of comity and federalism, judicial economy, and efficiency." *Delaware Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 512 (S.D.N.Y. 2015); *accord Little Rest. Twelve, Inc. v. Visan*, 458 B.R. 44, 61 (S.D.N.Y. 2011) (abstaining in the exercise of discretion where the claims arose from the same basic factual background, some issues overlapped and combining the two actions in one court would promote judicial economy); *Wallace v. Guretzky*, No. CV–09–0071 (SJF), 2009 WL 3171767, at *3 (E.D.N.Y. Sept. 29, 2009) ("[J]udicial economy is better served by the bankruptcy court's decision to abstain, since allowing parallel proceedings on issues which are admittedly 'nearly identical' to proceed would require two (2) separate trials with the same witnesses."); *In re Portrait*

*Corp. of Am., Inc.* 406 B.R. 637 (Bankr. S.D.N.Y. 2009) (overlapping factual issues

weigh in favor of permissive abstention); *In re Schick*, 232 B.R. 589, 600 (Bankr.

S.D.N.Y. 1999) ("[T]he considerations that drive an abstention motion coincide with the

most relevant *Sonnax* factors, to wit, judicial economy and efficient administration.");

*cf. Raul v. Bande*, 316 B.R. 127, 138 (S.D.N.Y. 2004) (denying permissive abstention and

equitable remand, *inter alia*, in the interest of judicial economy).  Here, many of the

claims are substantially related, are based on the same facts and require the same

witnesses and evidence to prove or counter the Trust's allegations in both litigations.

Moreover, counsel are the same in both cases.

### 1.    Claims relating to the Joint Venture

### a.    The Lender Action

The claims asserted in the First and Second Causes of Action in the Lender Action

allege that the Defendants tortiously interfered with CORE's performance under the

Loan Agreements and induced their breach.  According to the *New York Complaint*,

Apollo embarked on a scheme to recover its investment in an insolvent CORE Media.  It

began by selling the Elvis/Ali Rights for $115 million, falsely telling a CORE Media

senior officer that the proceeds would be deployed to generate revenue-producing

projects for CORE Media's benefit.  (*New York Complaint* at ¶ 55.)  Instead, Apollo

wanted the $115 million to sit on CORE Media's balance sheet, earning virtually no

interest, to make it easier to obtain financing for the combined Endemol-CORE Media

entity.  (*Id.* at ¶ 56.)

Apollo's scheme required that it remain secret from the CORE family.  At the

beginning of 2014, Apollo caused CORE Holdings to cease conducting board meetings,

and all corporate actions were conducted by an executive of Apollo designees (the Director Defendants) with no known meeting minutes, allowing Apollo to operate in secret and force CORE to enter into secret transactions.  (*Id.* at ¶¶ 60, 152.)  Apollo refused to permit CORE Media to invest in Endemol, pay the Secured Lenders or re-invest the Elvis/Ali Proceeds in new projects; this was commercially unreasonable from the perspective of CORE Media and the Secured Lenders.  (*Id.* at ¶ 56.)

In February 2014, Apollo and Fox signed a term sheet to form a combined entity consisting of CORE, Shine and Endemol.  (*Id.* at ¶ 57.)  After acquiring 100% of Endemol, and based on an overvaluation of CORE Media's equity (CORE Media was insolvent), Apollo engineered the formation of the Joint Venture.  It contributed 100% of its equity interests in CORE Holdings and Endemol to the Joint Venture and expected to receive between $100 million and $175 million from Fox for its contribution.  (*Id.* at ¶ 58.)  Important to the Trust's theory, the management of the Joint Venture, which consisted of two Fox appointees and one Apollo appointee, gave Fox majority voting power over the Joint Venture, and hence CORE Media's, business.  (*See id.* at ¶¶ 59, 81.) "But to ensure no interference from third parties, the Defendants intentionally hid the Business Combination Agreement from CORE and its creditors [and] the Trust first obtained a copy of the Business Combination Agreement only in 2017. . . ." (*Id.* at ¶ 80.) The entry into the *BCA* and the formation of the Joint Venture caused CORE to breach the Change of Control and Successor Obligor Clauses and interfered with its ability to perform its obligations under the Loan Agreements as alleged in the First Cause of Action in the *New York Complaint* (*id.* at ¶¶ 112-28), and induced CORE to breach the Lender Agreements as alleged in the Second Cause of Action.  (*Id.* at ¶¶ 129-44.)

24

### b.    This Adversary Proceeding

The same factual allegations in the *Complaint* underlie the Trust's breach of fiduciary duty claim in Count 1 and the related aiding and abetting claim in Count 2. The *Complaint* alleges that Apollo embarked on a scheme to cash out its equity in the insolvent CORE Media. (¶ 41.) As part of its scheme, Apollo directed CORE Media to sell the Elvis/Ali Rights for approximately $115 million in cash and place the proceeds in an unrestricted subsidiary of CORE Media. (¶ 42.) It was represented to CORE Media officers, presumably by Apollo, that the proceeds would be invested in new projects or used to acquire a stake in Endemol or in a revenue-producing project. (¶¶ 45 43, 86.) However, Apollo "needed the $115 million in cash to remain on the balance sheet at CORE, which on information and belief, would make it easier for Apollo to obtain financing for the combined Endemol-Core entity" and "refused to permit CORE to do anything commercially reasonable with the cash generated from the sale of the Elvis Rights and the Ali Rights." (¶ 47; *see* ¶¶ 84, 88, 89.)

Again, secrecy was required. To hide its intentions from CORE Media, the Director Defendants, who were directors of CORE Media, made sure not to conduct board meetings throughout 2014. (¶ 51.) Instead, they made decisions through an executive committee established by Apollo and there are no minutes of any meetings of the CORE Media board. (*Id.*)

In February 2014, Apollo drafted a term sheet involving Apollo, Endemol, CORE Media, Shine and Fox "to effectuate the consolidation, merger, or amalgamation of the Endemol, CORE and Shine businesses." (¶ 44.) The term sheet stated that the contemplated business, which ultimately became the Joint Venture, would be partially

25

funded with the proceeds from the sale of the Elvis/Ali Rights.  (*Id.*)  In October 2014, it entered into the *BCA* under which, "Apollo Global transferred its stock in CORE Holdings to the Joint Venture, which combined CORE Holdings, Endemol and Shine, and, using an inflated value, Apollo received, on information and belief, at least $100 million (and as much as $175 million) in cash from Fox." (¶ 48.)  "But to ensure no interference from third parties, the Defendants intentionally hid the existence of the BCA from CORE Media's officers and its creditors.  Indeed, it was not until 2017 that the Trust first obtained a copy of the BCA. . . ."  (¶ 50.)

The foregoing recitation shows that the First and Second Causes of Action in the Lender Action and Counts 1 and 2 in the *Complaint* arise from Apollo's alleged scheme to extract its investment in CORE by selling the Elvis/Ali rights, hoarding instead of investing the proceeds to facilitate financing the Joint Venture, hiding its intentions and actions from CORE's senior officers and creditors, and finally, forming the Joint Venture.  In the Lender Action, the Trust argues that the execution of the scheme, including the hoarding of the Elvis/Ali Proceeds and the formation of the Joint Venture, tortiously interfered with the Secured Lenders' contract rights and induced CORE Entertainment's breach.  In the adversary proceeding, the Trust argues that the execution of the same scheme, including the hoarding of the Elvis/Ali Proceeds Joint Venture and culminating in the formation of the Joint Venture, stole a corporate opportunity that belonged to CORE Media.  The circumstances surrounding the alleged scheme and the formation of the Joint Venture are common to both cases, form the basis of both sets of claims and will require the same evidence to prove or rebut.

### 2.    Claims relating to the Huff Judgment

The allegations in the Lender Action do not directly concern the payment of the

Huff Judgment.   Nevertheless, the findings regarding the change of control bear directly

on the Counts 3 through 6 in the *Complaint* and splitting the litigation between two

courts may lead to inconsistent results.   The substance of the Lender Action is that Fox

acquired control of CORE Holdings and its affiliates, including CORE Media, through its

control of the Joint Venture (CORE Holdings' parent), triggering the Change of Control

and Successor Obligor Clauses.   Moreover, the change of control was not a mere

technical breach leaving Apollo in actual control; the Joint Venture and Fox acquired

actual control of CORE Media.   The Trust alleges that "[t]he Joint Venture . . . inherited

Apollo's complete control and domination over CORE Holdings (and, by extension,

CORE)" (*New York Complaint* at ¶ 83), "Fox ha[d] the power to block the Joint Venture

from taking action in numerous, material circumstances" (*id.* at ¶ 93), the practical

effect of the management of the Joint Venture was "to dilute the voting power of

Apollo's Voting Stock in CORE to less than a majority," (*id.* at ¶ 94), and importantly,

"Fox in fact actually controlled the business of the Joint Venture (thereby controlling

CORE) because it could appoint the majority of the Joint Venture's management

committee." (*Id.* at ¶ 95.)  Furthermore, "[t]he Joint Venture, through Endemol, treated

CORE's assets as if such assets were the Joint Venture's own property and continued

operating CORE's businesses." (*Id.* at ¶ 154.)

Counts 3 and 4 asserted in the *Complaint* conflict with the theory of the Lender

Action because they are premised on Apollo's continuing control of CORE Media after

the formation of the Joint Venture.   Count 3 alleges that CORE Holdings, acting through

the Director Defendants, breached their fiduciary duties "when they *forced* CORE Media to authorize and pay the [Huff] Payment," (¶ 99) (emphasis added), "instead of pursuing restructuring options that would have provided a far better return for CORE Media's creditors, at a time when CORE Media was insolvent and lacked reasonable capital," (¶ 101 (a)), and Count 4 alleges that the Defendants aided and abetted the breach of fiduciary duty by "[*d*]*irecting* CORE Media to pay the Huff Judgment instead of pursuing restructuring options." (¶ 106(a) (emphasis added).)

These allegations contradict the theory underpinning *New York Complaint*. While CORE Holdings remained the indirect parent of CORE Media, and the CORE Holdings Board approved the Huff Payment, Fox and the Joint Venture controlled CORE Holdings and CORE Media after the formation of the Joint Venture. According to the *Complaint*, however, Apollo's designees, the Director Defendants, continued to control CORE Holdings and forced CORE Media to pay the Huff Judgment[23] in breach of their fiduciary duties. Some Court (but not two) must decide who controlled CORE Holdings and CORE Media following the formation of the Joint Venture —Fox and the Joint Venture or Apollo and CORE Holdings through the Director Defendants — and thereby "directed" CORE Media to pay the Huff Judgment.

Counts 5 and 6 substantially overlap with the breach of fiduciary duty claims asserted in Counts 3 and 4 and face the same inconsistencies with the Lender Action. Counts 5 and 6 seek to avoid the Huff Payment as an intentional fraudulent transfer

---

[23]    The allegation also ignores the fact that by this time the CORE Holdings Board consisted of ten directors, three designated by Apollo, three designated by Fox and four unaffiliated, and the nine voting directors unanimously approved the Huff Payment.

under bankruptcy law (Count 5)[24] and the New York Debtor and Creditor Law

("NYDCL") (Count 6).[25]  Notwithstanding the fraudulent nature of the Huff Payment,

the Trust did not sue Huff; instead it seeks to recover the value of the Huff Payment

from Apollo Global on the theory that it was the party for whose benefit the transfer was

made.[26]  Relying on the Director Defendants' and Apollo's wrongful intent, which the

*Complaint* imputes to CORE Media, (¶¶ 110, 118), the Trust alleges the following badges

of fraud:  Apollo Global and the Director Defendants (i) directed the insolvent CORE

Media to pay the Huff Judgment instead of pursuing restructuring options that would

have provided a better return for other creditors; (ii) intentionally failed to disclose to

---

[24]    Bankruptcy Code § 548(a)(1)(A) provides in pertinent part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted.

[25]    NYDCL § 276 states in pertinent part:

> Every conveyance made . . .  with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

> The Trust can utilize the provisions of NYDCL § 276 through the operation of Bankruptcy Code § 544(b)(1), which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

[26]    Bankruptcy Code § 550(a)(1) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

the CORE Holdings board that Apollo affiliates were contractually obligated to pay the Huff Judgment and faced indemnification liability if it was not paid; (iii) hid the *BCA* from CORE Media's creditors and senior officers; (iv) ignored the recommendations of CORE Media's officers not to pay the Huff Judgment; (v) caused CORE Media to pay the Huff Judgment before independent directors were appointed to CORE Entertainment's board; (vi) and actively discouraged the full and fair exploration of maximizing value alternatives including a chapter 11 reorganization.  (¶¶ 111, 119.)  Except for hiding the *BCA* from CORE Media's senior officers and creditors, these are the exact same allegations that the Trust made in support of its breach of fiduciary duty claim in Count 3, (*id.* at ¶ 101), and substantially track the aiding and abetting claim in Count 4.  (*Id.* at ¶ 106) (alleging the Defendants aided and abetted the Director Defendants' and CORE Holdings' breach of fiduciary duty by directing CORE Media to pay the Huff Judgment instead of pursuing restructuring alternatives that provided a better return to creditors and by failing to disclose to the board that Apollo Global affiliates were contractually obligated to pay the Huff Judgment and faced indemnification liability if it did not).

Notwithstanding their core nature, the intentional fraudulent transfer claims rely on the same wrongful conduct as the claims in Counts 3 and 4 and suffer from the same inconsistencies with the Lender Action.[27]  While some of the badges are independent of

---

[27]    The Trust argues that the Court retained exclusive jurisdiction under the confirmed plan "[t]o recover all assets of the Debtors and property of the Estates," Plan, Art. XIII(q), and while the Plan cannot confer jurisdiction, the Plan provision "is evidence that this Court is the proper forum to exercise jurisdiction over 'core' fraudulent transfer claims arising under the Bankruptcy Code and related estate causes of action." (*Opp.* at 8.)  I do not dispute that this Court is a proper forum, but I reject the implicit notion that is the only proper forum, *see* 28 U.S.C. § 1334(b) (granting the district courts original but not exclusive jurisdiction over bankruptcy proceedings), or the most appropriate forum in this case.  The decision in this case to abstain cannot be viewed in a vacuum.  It results from the way the Trust has split factually similar claims between two different actions pending in two different courts.

the control issue (the non-disclosure issues), the "core" claim is that the Director Defendants and Apollo Global, through their control of CORE Holdings, caused CORE Media to pay the Huff Judgment for Apollo's selfish purposes.  Whether the Director Defendants or Apollo controlled CORE Holdings or could have caused CORE Media to do anything once the Joint Venture was formed is also the issue presented in the Lender Action.  There, the Trust alleges that Apollo lost control of CORE Holdings and CORE Media; here, it alleges that it did not.  For the reasons stated, the Trust should present its overlapping and inconsistent theories to one court, not two.

Accordingly, the Court will abstain in the exercise of its discretion from deciding the claims asserted by the Trust and does not reach the alternative issue of whether the *Complaint* fails to allege legally sufficient claims for relief.  Settle order on notice.

Dated:   New York, New York
         March 5, 2019


                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge